360 A.2d 607
**CITY OF PITTSBURGH, Appellant,**
**v.**
**COMMONWEALTH of Pennsylvania**
**and Louis J. Harvey.**

Supreme Court of Pennsylvania.

Argued March 9, 1976.

Decided July 6, 1976.

Reargument Denied Aug. 17, 1976.

Eugene B. Strassburger, III, Deputy City Sol., Mead J. Mulvihill, Jr., City Sol., Pittsburgh, for appellant.

Janet Moschetta, Asst. Atty. Gen., Paul H. Titus, Kaufman & Harris, Frederick R. Nene, Asst. Atty. Gen., Pittsburgh, for appellees.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

On April 22, 1974, the Commonwealth Bureau of Corrections of the Department of Justice (appellee) entered into an agreement to lease premises on South Aiken Avenue in Pittsburgh for use as a pre-release center for women convicts.[1] Neither the Commonwealth nor the lessor applied to the City of Pittsburgh (appellant) for a certificate of occupancy, variance or other zoning authorization for the intended use. The City filed an action in the Commonwealth Court seeking to enjoin use of the premises as a pre-release center because no certificate of occupancy had been obtained.[2]

On January 24, 1975, Judge Rogers issued an adjudication with findings of fact and conclusions of law, and entered a decree nisi dismissing the complaint. The City filed exceptions to the decree which were dismissed by the Commonwealth Court en banc in an opinion by Judge Rogers. This appeal ensued.[3]

The Commonwealth Court held that state agencies were not subject to the zoning ordinances of municipali-

1. The Bureau acted pursuant to Act of July 16, 1968, P.L. 351, § 1, 61 P.S. § 1051 (Supp.1975).

2. A preliminary injunction was issued on August 6, 1974, because the Governor had not approved the location as required under the Act. After approval by the Governor the Commonwealth Court dissolved the injunction on September 6, 1975.

3. We hear this appeal under authority of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 203, 17 P.S. § 211.203 (Supp.1975).

ties.   In the opinion dismissing the exceptions, the court stated:

"The law of Pennsylvania is that the Commonwealth is not subject to the zoning requirements of municipal subdivisions and that it is not required to obtain or apply for zoning permits.   *General State Authority v. Borough of Moosic,* 10 Pa.Cmwlth. 270, 310 A.2d 91 (1973); *Township of Lower Allen v. Commonwealth,* 10 Pa.Cmwlth. 272, 310 A.2d 90 (1973)."

We do not agree.   Because we do not find that the Legislature intended the Bureau of Corrections to be immune from local zoning regulations we reverse the order of the Commonwealth Court.

▬▬▬   Appellee and the Commonwealth Court perceive this action as merely a controversy between a city and a state.[4]   This case, however, presents a conflict be-

4.   Such an analysis provides a simple result and has occasionally been employed by courts in other jurisdictions.   Other cases of this nature have been analyzed in considerably different manners by courts in other jurisdictions.

For example, on some occasions courts have relied on which body enjoyed a superior position in the governmental heirarchy, ruling that a local regulation cannot bind a state agency.   See, e. g., *Davidson County v. Harmon,* 200 Tenn. 575, 292 S.W.2d 777 (1956); *Aviation Services v. Board of Adjustment,* 20 N.J. 275, 119 A.2d 761 (1956); *Metropolitan Dade Co. v. Parkway Towers Condominium Assoc.,* 281 So.2d 68 (Fla.App.1973).   Other courts have been able to look to state statutes to determine if the Legislature intended the state agency to be immune from local zoning regulations.   See, e. g., *Opinion of the Justices,* 113 N.H. 217, 304 A.2d 872 (1973); *Shell Oil Co. v. Board of Adjustment of Hanover Twp.,* 38 N.J. 403, 185 A.2d 201 (1962); *Gulf, C. & S. F. Railway Co. v. White,* 281 S.W.2d 441 (Tex.Civ.App.1955); *Mayor and Aldermen of Annapolis v. Anne Arundel Co.,* 271 Md. 265, 316 A.2d 807 (1974).

Other courts have found immunity from local zoning regulations when the public entity seeking the immunity is acting in a "governmental" rather than a "proprietary" capacity.   See, e. g., *Water Works Board of Birmingham v. Stephens,* 262 Ala. 203, 78 So.2d 267 (1955); *Nichols Engineering & Research Corp. v. State,* 59 So.2d 874 (Fla.1952); *Baltis v. Westchester,* 3 Ill.2d 388, 121 N.E.2d 495 (1954); *Taber v. Benton Harbor,* 280 Mich. 522, 274 N.W. 324 (1937); *Bloomfield v. New Jersey Highway Authority,* 18 N.J. 237, 113 A.2d 658 (1955); *Nehrbas v. Incorporated Village*

tween two instrumentalities of the state attempting to wield their legislatively created powers rather than an action between an inferior and a superior government body.

In *Commonwealth v. Moir*, 199 Pa. 534, 541, 49 A. 351, 352 (1901), this Court stated:

> "Municipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the Legislature and subject to change, repeal or total abolition at its will."

Cf. *Warren Borough v. Willey*, 359 Pa. 144, 146, 58 A.2d 454, 455 (1948). See also Pa.Const., Art. 9, § 1; *Cali v. City of Philadelphia*, 406 Pa. 290, 177 A.2d 824 (1962). Municipalities derive their power to enact zoning ordinances from specific grants by the Legislature. *Kline v. City of Harrisburg*, 362 Pa. 438, 68 A.2d 182 (1949); Act of March 31, 1927, P.L. 98, § 1, 53 P.S. § 25051 (1957). For that reason it is important to realize that

*of Lloyd Harbor,* 2 N.Y.2d 190, 159 N.Y.S.2d 145, 140 N.E.2d 241 (1957); *McKinney v. High Point,* 237 N.C. 66, 74 S.E.2d 440 (1953); *Charleston v. Southeastern Constr. Co.,* 134 W.Va. 666, 64 S.E.2d 676 (1950); *Pruett v. Dayton,* 39 Del.Ch. 537, 168 A.2d 543 (1961); *City of Scottsdale v. Municipal Court,* 90 Ariz. 393, 368 P.2d 637 (1962). This Court has recognized the difficulty in applying the governmental-proprietary distinction and has abandoned the distinction in dealing with tort liability. See *Ayala v. Philadelphia Board of Education,* 453 Pa. 584, 597–98, 305 A.2d 877, 883–884 (1973).

Other courts have found that where a particular state agency has been given the power of eminent domain, its exercise of that power supersedes the zoning power. The possession of the power by the agency renders the agency immune from zoning regulations. See, e. g., *State ex rel. Askew v. Kopp,* 330 S.W.2d 882 (Mo.1960); *Mayor of Savannah v. Collins,* 211 Ga. 191, 84 S.E.2d 454 (1954).

See generally, Note, Governmental Immunity From Local Zoning Ordinances, 84 Harv.L.Rev. 869 (1971); Comment, Inapplicability of Municipal Zoning Ordinances to Governmental Land Uses, 19 Syr.L.Rev. 698 (1968); Comment, Applicability of Zoning Ordinances to Governmental Land Use, 39 Tex.L.Rev. 316 (1961); Annot. 61 A.L.R.2d 970 (1958).

the municipalities exercising such state powers are "equally agents of the state." Note, 84 Harv.L.Rev. 869, 877 (1971).

■ Resolving the conflict simply by saying that the "state" agency must prevail because it is exercising the power of the sovereign overlooks that the zoning power the city seeks to exercise is also a sovereign power. Such a resolution ignores the interests the state seeks to promote by legislative grants of powers to municipalities. Interests such as those fostered by comprehensive land use planning statutes are too important not to be recognized as involving exercises of state power.

The error of oversimplifying such disputes was pointed out by Justice Hall of the Supreme Court of New Jersey in *Rutgers, State University v. Piluso*, 60 N.J. 142, 286 A.2d 697 (1972):

> "The question of what governmental units or instrumentalities are immune from municipal land use regulations, and to what extent, is not one properly susceptible of absolute or ritualistic answer. Courts have, however, frequently resolved such conflicts in perhaps too simplistic terms and by the use of labels rather than through reasoned adjudication of the critical question of which governmental interest should pevail in the particular relationship or factual situation."

60 N.J. at 150, 286 A.2d at 701.[5]  We therefore approach

---

5.  "Traditionally courts have responded in rather simplistic terms to attempts by governmental units to circumvent restrictive municipal zoning ordinances.  Inconsistent results proliferate due largely to state court reliance upon artificial labels to rationalize 'governmental immunity' from local zoning ordinances.  Such unhelpful epithets as the 'governmental-proprietary distinction,' or the 'inherent immunity of the sovereign . . . .' often serve as distracting surrogates for reasoned adjudication.  They beg the critical question of which governmental interest should prevail when there is a conflict between the zoning ordinance of one political unit and the statutory authority of another unit to perform a designated public function."
Note, Governmental Immunity From Local Zoning Ordinances, 84 Harv.L.Rev. 869 (1971).

this case as one involving conflicting governmental interests by public bodies seeking to exercise powers derived from the Commonwealth.

This Court has previously considered the question whether one public entity is subject to the zoning regulations of another. In *Wilkinsburg-Penn Joint Water Authority v. Borough of Churchill*, 417 Pa. 93, 207 A.2d 905 (1965), we held that a joint water authority seeking to build a water tower was not immune from a borough's zoning power. Although the Commonwealth was not directly a party there, the analysis employed in that case is applicable here because the conflicting powers of the public bodies both emanate from the Commonwealth. As this Court stated: "the parties 'have only the power and authority granted them by enabling statutory legislation.' . . . In other words, the problem raised is one of statutory interpretation." 417 Pa. at 100, 207 A. 2d at 909, quoting *White Oak Borough Authority Appeal*, 372 Pa. 424, 93 A.2d 437 (1953). We, therefore, weighed the conflicting statutory powers and found that the Legislature did not intend that a water authority's powers to purchase and use land should override municipal zoning regulations. After examining both statutes we concluded:

"the objectives of zoning regulations are more comprehensive than and, in fact, include the objectives of the water Authority. . . . [The] Municipality Authorities Act . . . would not require the Authority to make its service determinations with due regard to the comprehensive objectives of zoning, even if it had the ability to do so. Accordingly, the objectives of both statutes can be secured only if the authority's land is subject to the Borough's zoning power."

417 Pa. at 103, 207 A.2d at 910.

In *Pemberton Appeal*, 434 Pa. 249, 252 A.2d 597 (1969), we again balanced the statutory directives to resolve a dispute involving conflicting assertions of author-

ity by public bodies. There the school authority purchased land for construction of a school and the township claimed the construction was prohibited under a local zoning ordinance. We found that the public school code

> "clearly and unequivocally vests precise and specific powers in the school district . . . to locate, determine, acquire, and if necessary condemn, all real estate necessary for schools. And the township's zoning regulation clearly is determining the location of the schools. It thus cannot be squared with [The School Code]."

434 Pa. at 256, 252 A.2d at 600. See also *School District of Philadelphia v. Zoning Board of Adjustment,* 417 Pa. 277, 207 A.2d 864 (1965) (zoning regulation requiring off street parking held applicable to proposed school construction; school code provisions weighed against the city's zoning power); *Institution District of Delaware County v. Township of Middletown,* 450 Pa. 282, 299 A. 2d 599 (1973) (legislative intent used to determine if institution district subject to local zoning regulations).

■ Our analyses in those cases recognize that the powers sought to be exercised emanate from the Commonwealth and were dependent upon the General Assembly for their creation and existence. When there is an apparent conflict in the use of such powers we must look to the intent of the Legislature to determine which exercise of authority is to prevail. As this Court did in *Wilkinsburg-Penn, Penberton,* and the other cases, we must examine the nature of the legislative grant, the purpose for which it was created, and the facts of the individual case to determine which statutory power must prevail.[6]

**6.** This balancing of statutory purposes gives the greatest deference to the enactments of the Legislature. The value of this approach has been recognized by the American Law Institute in the proposed Model Land Development Code, § 12–201 (Council Draft No. 11). The Comments to that section state:

■ The Bureau of Correction leased the premises for the pre-release center under the authority given to it by the Act of July 16, 1968, P.L. 351, § 1, 61 P.S. § 1051 (Supp.1975). That section provides:

> "The Bureau of Correction, Department of Justice, shall have the power and its duty shall be to establish with the approval of the Governor such prisoner pre-release centers at such locations throughout the Commonwealth as it may deem necessary to carry out effective prisoner pre-release programs therefrom."

There is no indication in that Act that the Legislature intended the Bureau of Correction to be immune from local zoning regulations.[7] Although the Act gives general au-

> "The Code substantially departs from most existing law. This Section provides that, unless exempted by statute, governmental development is subject to regulation by local governments . . . ."

7. In his dissenting opinion, Mr. Justice Eagen states that the statutory language allowing the Bureau to establish pre-release centers "at such locations . . . as [it] may deem necessary" expresses a legislative intent that the Bureau is not to be bound by local zoning regulations. This contention is not persuasive for several reasons. First, there is no indication in the statute, nor is there a legislative history, showing that the Legislature ever considered how conflicts with local zoning requirements are to be resolved. Second, if the Legislature intended that the Bureau site selection was to transcend local land use regulation, it could have expressed that intention in more definite ways, e. g., by clear language to that effect or by the grant of eminent domain. Third, in the enactment of prior legislation concerning the construction of such institutions, the Legislature itself made specific provisions for site selection. See, e. g., Act of July 29, 1953, P.L. 1435, § 2, 61 P.S. § 912 (1965); Act of June 21, 1937, P.L. 1944, § 1, 61 P.S. § 545–1 (1965); Act of June 12, 1931, P.L. 512, § 6, 61 P.S. § 732 (1965); Act of May 1, 1915, P.L. 212, §§ 2–4; Act of July 25, 1913, P.L. 1311, §§ 1–5; Act of May 18, 1945, P.L. 815, § 2, 71 P. S. § 1519.32 (1962). Because the Legislature was not itself making the site selection or delegating that responsibility to the Department of Welfare or the Department of Property and Supplies, it included the language quoted by the dissent to make clear that the Board of Corrections, not some other Commonwealth Department, would select the sites. Thus, this brief statutory authorization only designates what Commonwealth department should supervise site selection and does not authorize the disruption of local zoning ordinances.

thorization for the establishment of such centers, it provides no mandate concerning specific site selection.

The City is granted the power to enact zoning regulations under the Act of March 31, 1927, P.L. 98, § 1, 53 P.S. § 25051 (1957). That section provides:

"For the purpose of promoting health, safety, morals or the general welfare of the community, cities of the second class are hereby empowered to regulate, restrict or determine, the height, number of stories and size of buildings and other structures, the percentage of lot that may be built upon, the size of yards, courts and other open spaces, the density of population, and the location, use and occupancy of buildings, structures and land for trade, industry, residence or other purposes."

The Act includes a statutory directive for a department of city planning to be created in every city of a second class. Id., P.L. 1011, § 1, 53 P.S. § 22761 (1957). The Act also directs the city to make and adopt a master plan "for the physical development of the city . . . as well as a zoning plan . . . for use of the buildings and land." Id. § 5, 53 P.S. § 22765.

The zoning enabling acts establish strict and specific criteria by which the city must plan and supervise the comprehensive development of its land. Unlike statutes in which the Legislature evinces an intent to override municipal zoning powers either by the inclusion of the

Moreover, our decision does not delete the words "at such location throughout the Commonwealth" from the statute, as the dissent asserts. Read in the context of the entire pre-release statute, these words mean that the Bureau decides where to place a pre-release center. And its decision may place the center anywhere in the Commonwealth but may be subject to other statutory enactments where we can discern the Legislature intended the other enactments to take precedence. Under the dissenter's reading of the pre-release statute the Bureau could choose to build a pre-release center in the courtyard of the Philadelphia City Hall.

power of eminent domain to the state agency [8] or clear language showing the overriding intent,[9] the Act authorizing the Bureau of Corrections to establish pre-release centers evinces no such overriding intent. We are reinforced in our conclusion by § 8 of the Act of March 31, 1927, P.L. 98, 53 P.S. § 25058 (1957)—the Act under which Pittsburgh enacted its zoning ordinances. That section provides:

"Whenever the regulations made under authority of this act, require  .   .   .  or impose higher standards than are required in any other statute  .   .   .  the provisions of the regulations made under authority of this act shall govern."

The Legislature has explicitly directed that whenever zoning regulations impose higher standards "than are required in any other statute" the zoning regulations "shall govern." In this case the local zoning regulations set higher standards for governing population density in the neighborhood than the Bureau is willing to recognize. Under the meager authority of the pre-release statute, the Bureau of Corrections seeks to abrogate the zoning regulations. In the absence of explicit language, such as we saw in *Pemberton*, whereby the Legislature evinces a

8. See, e. g., Act of May 16, 1940 (Extra Sess.), P.L. (1941), 949, § 9, 36 P.S. § 653h as amended (Supp.1975), giving the Pennsylvania Turnpike Commission the power to condemn property under the Act.

9. The language of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, art. I, §§ 101 et seq., 24 P.S. §§ 1–101 et seq., sufficiently showed an overriding intent. *Pemberton Appeal*, 434 Pa. 249, 252–53, 252 A.2d 597, 599 (1969).

Contrary to the dissent's assertion, our decision is in no way inconsistent with *Pemberton Appeal*, supra. We there found that the School Code placed exclusive discretion in the school boards for choosing site selection. The dissent concedes that "the language relied on in *Pemberton* may be more explicit than that relied on by the Board instantly." That is the crucial distinction. In *Pemberton* there was a discernible legislative intent and an obvious policy choice which dictated the result. In the case before us the language of the statute does not compel that result.

clear intent to override local zoning regulations, this Court is bound to follow the mandate of the zoning enabling act.

We therefore hold that the Bureau of Corrections, Department of Justice acting under the Act of July 16, 1968, P.L. 351, § 1, 61 P.S. § 1051 (Supp.1975), in establishing a pre-release center is subject to local zoning regulations enacted pursuant to state enabling laws.[10]

Our decision is consistent with our duties under the Statutory Construction Act, 1 Pa.C.S.A. § 1933 (Supp. 1975): "whenever a general provision in a statute shall be in conflict with a special provision in  .  .  .  another statute, the two shall be construed, if possible, so that effect may be given to both." Our decision today gives the intended effect to both statutes.

This is not a case where a municipality has attempted to completely prohibit the existence of a pre-release center within its boundaries.[11]  The city's master plan and

10.  The lessee of property is bound by zoning ordinances in the same manner as the lessor is; zoning ordinances enacted pursuant to a state statute are aimed at the use of property. See *Fernald v. Lower Merion Twp.,* 75 Mont.L.R. 84 (PA C.P.1958); *Dukes v. Shell Oil Co.,* 40 Del.Ch. 174, 177 A.2d 785 (1962); *Feinberg v. Southland Corp.,* 268 Md. 141, 301 A.2d 6 (1973); *State ex rel. Parker v. Konopka,* 119 Ohio App. 513, 200 N.E.2d 695 (1963); *Abbadessa v. Board of Zoning Appeals,* 134 Conn. 28, 54 A.2d 675 (1947).

Our decision today is similar to those in other jurisdictions where courts have considered potentially conflicting statutory authorizations and found the "state" agency subject to local zoning regulations. See, e. g., *City of Des Plaines v. Metropolitan S. D. of Greater Chicago,* 124 Ill.App.2d 301, 260 N.E.2d 340 (1970); *Cameron v. Zoning Agent of Billingham,* 357 Mass. 757, 260 N.E. 2d 143 (1970); *Washington Township v. Ridgewood Village,* 46 N.J.Super. 152, 134 A.2d 435 (1957); *State v. Ohio Power Co.,* 163 Ohio St. 451, 127 N.E.2d 394 (1955).

11.  The question is not, as the dissent contends, whether our decision will limit pre-release centers to areas not conducive to rehabilitation.  The issue is whether the city's duty to plan land use responsibly under the zoning acts is subjugated to the Bureau's site selection responsibility.  A comparison of the zoning enabling acts—which are very specific concerning when zoning acts must yield—with the meager words of the pre-release statute

zoning ordinances provide areas where pre-release centers may be established. The Bureau of Corrections has not argued either that there is no alternative location available, nor that the city has acted arbitrarily in refusing an occupancy permit. Hence it must be concluded on this record that the Bureau's intended use is subject to the applicable zoning ordinance.

Here suitable alternatives exist to accommodate both the community's interest in maintaining the integrity of low-density, residential zoning and the needs of the Bureau.

Decree of the Commonwealth Court reversed.

EAGEN, J., filed a dissenting opinion in which JONES, C. J., and NIX, J., join.

EAGEN, Justice (dissenting).

While I agree with the method of analysis employed by Mr. Justice Roberts, that is an analysis of the statutory grants of authority to the City of Pittsburgh [Hereinafter: City] and the Bureau of Corrections [Hereinafter: Bureau] is necessary, see *Pemberton Appeal,* 434 Pa. 249, 252 A.2d 597 (1969) and *School District of Philadelphia v. Zoning Board of Adjustment,* 417 Pa. 277, 207 A.2d 864 (1965), I do not agree that the statutory grant of authority to the Bureau instantly does not evidence an intent to override the City's zoning authority with regard to the location of pre-release centers within the city. The statutory grant of authority expressly states such an intent and the wisdom of the Legislature in expressing such an intent is obvious from the nature of the centers the Bureau is duty bound to establish.

hardly results in the conclusion that the pre-release statute shows the Legislature wished to resolve a conflict such as this by giving the Bureau of Corrections responsibility to ignore comprehensive zoning enactments. The city has enacted a careful and comprehensive plan for the density of its areas. There are many suitably zoned areas of the city open to pre-release centers which are conducive to rehabilitation without disrupting the city's wise determinations of population density allocation.

The Act of July 16, 1968, P.L. 351, § 1, 61 P.S. § 1051 (Supp.1975–1976) provides:

> "The Bureau . . . shall have the power and its duty shall be to establish . . . such prisoner pre-release centers *at such locations throughout the Commonwealth as it may deem necessary* to carry out effective prisoner pre-release programs therefrom." [Emphasis supplied.]

This statute expressly grants the authority, indeed imposes a duty, not only to establish centers, but to establish them *at such locations throughout the Commonwealth* as the Bureau deems necessary. This express language clearly evidences an intent to override the zoning authority of the City; it serves no other purpose. Yet, despite this language, Mr. Justice Roberts states no such intent is indicated. The effect of Mr. Justice Roberts' interpretation is to delete the words, "at such locations throughout the Commonwealth" from the statute. Such an interpretation clearly violates the Act of November 25, 1970, P.L. 707, No. 230, added December 6, 1972, § 3, 1 C.P.S.A. § 1921 (Supp.1975–1976) which requires this Court to follow the explicit language of statutes.

Once this expressed intent is properly recognized, whether a conflict between the Bureau's statutory grant of authority and the City's exists, or whether it does not exist, this Court should rule that the Bureau is not subject to the City's zoning restrictions with regard to the location of pre-release centers within the city. Where an irreconcilable conflict exists special provisions must be construed as an exception to general provisions. Thus, since the Bureau's grant of authority is clearly special and the City's clearly general, the Bureau's authority constitutes an exception to the City's. Act of November 25, 1970, P.L. 707, No. 230, added December 6, 1972, P.L. 1339, No. 290, § 3, 1 C.P.S.A. § 1933. Where the conflict can be resolved by giving effect to both statutes, this Court is bound to rule such that both statutes are given

effect. Thus, this Court is bound to rule that the special provision granting authority to the Bureau is to be given effect along with the City's general provision granting it zoning authority. Act of November 25, 1970, P.L. 707, No. 230, added December 6, 1972, P.L. 1339, No. 290, § 3, 1 C.P.S.A. § 1933 and *Pemberton Appeal,* supra. But, by ignoring the expressed intent of the Legislature, the opinion of Mr. Justice Roberts avoids these well-settled rules of construction which should control this appeal.

Not only is the opinion of Mr. Justice Roberts contrary to the express language of the statutes here involved, it is irreconcilable with this Court's opinion in *Pemberton Appeal,* supra. In that case, this Court ruled that the locations of schools could not be controlled by the zoning power of a township. In so ruling, this Court relied on the specific grant of authority given to a school district. The statute granting the authority provided:

"The location and amount of any real estate required by any school district . . . shall be determined by the board of school directors. . . ."

Public School Code of 1949, Act of March 10, 1949, P.L. 30, art. VII, § 702, 24 P.S. § 7–702. And see *School District of Philadelphia v. Zoning Board of Adjustment,* supra, which foreshadowed the result and reasoning of *Pemberton Appeal,* supra. While the language relied on in *Pemberton Appeal,* supra, may be more explicit than that relied on by the Bureau instantly, the language instantly admits of no other rational interpretation than a grant of specific power to the Bureau to determine the location of pre-release centers.

Finally, not only does sound reasoning support the interpretation of this statute as granting such power to the Bureau, the wisdom in granting the Bureau such power is obvious. Undoubtedly one's environment may foster either criminal or non-criminal behavior. So too, one's environment may foster rehabilitation or the lack of it.

Zoning boards have no expertise in determining locations which will aid in the rehabilitation process, particularly at such a crucial stage as readjustment to a free environment. Such determinations are within the expertise of the Bureau. And while the Legislature recognized this fact and provided in express terms the power to the Bureau to control the environment of pre-release prisoners, the position taken by Mr. Justice Roberts, by ignoring the terms of the statute, destroys the effect of this wise decision.

Mr. Justice Roberts states that the position set forth in this dissent is not persuasive for three reasons. Opinion of the Court, n. 7.

First, he states that there is no legislative history and that the relevant statute indicates no intention to override the City's zoning authority. Undoubtedly there is no legislative history, but the lack of one adds nothing to the determination this Court must make and has absolutely nothing to do with the persuasiveness of the position adopted in this dissent. Additionally, as indicated supra and discussed in more detail infra, the statute not only expressly grants the Bureau the power to override local zoning and thereby reveals the legislative intent, it also expressly states, and thereby reveals, the purpose of the Legislature in granting this power to the Bureau.

Second, Mr. Justice Roberts states the Legislature could have been more clear and explicit if it wished to grant the Bureau this power or could have granted the Bureau eminent domain power. Undoubtedly the Legislature could have explicitly stated that the Bureau's determinations as to locations shall not be subject to local zoning. If it had done so, this Court would not now be confronted with this issue. However, the lack of such explicit language in the grant of authority to school boards did not deter this Court from ruling contrary to the position adopted by Mr. Justice Roberts when it decided *Pemberton Appeal*, supra. See Public School Code

of 1949, Act of March 10, 1949, P.L. 30, art. VII, § 702, 24 P.S. § 7–702. Moreover, the presence or absence of eminent domain power is not a valid consideration. In *Pemberton Appeal,* supra, this Court did not mention or in any way rely on the power of school boards to exercise eminent domain in deciding that case. Furthermore, additional power to force a sale, rather than purchase from willing sellers the locations for pre-release centers, is not a relevant consideration.

Third, Mr. Justice Roberts reasons that since other statutes, which establish much larger institutions than those involved instantly, such as prisons, designated locations for those institutions, the Legislature by the language relied on in this dissent was merely designating the Bureau, as opposed to the Department of Supplies, as the authority to select locations for pre-release centers. If this were a correct interpretation of the statute, then the Legislature need only have stated:

"The Bureau . . . shall have the power . . . to establish . . . pre-release . . . centers . . . throughout the Commonwealth."

Such language would have clearly designated the Bureau. Yet, the Legislature included the words:

*"at such locations . . . as it* [the Bureau] *may deem it necessary to carry out effective programs."* [Emphasis supplied.]

Act of July 16, 1968, P.L. 351, § 1, 61 P.S. § 1051 (Supp.1975–76). This language not only expresses an intent to override zoning but it also reveals the reason why the Legislature did so, that is, only the Bureau has the expertise to determine locations which will effectively implement the programs established by this Act.

Mr. Justice Roberts states this case is distinguishable from *Pemberton Appeal* supra, because, as this dissent indicates, the language there involved was more explicit. Opinion of the Court n. 9. That the language there was

more explicit is correct, but it does not follow that the language involved in this appeal is not explicit enough to determine the legislative intent to override local zoning. Moreover, in *Pemberton Appeal,* supra, the Legislature did not state why it was granting to school boards the power to override local zoning. Instantly, it did. The statute states that the power is granted to insure that effective programs will be implemented. And contrary to Mr. Justice Roberts' assertion that this dissent confuses the issue into whether today's decision results in pre-release centers being less conducive to rehabilitation, this dissent clearly recognizes the issue as one of ascertaining the legislative intent in order to determine if the specific power was intended to be granted to the Bureau to override local zoning in locating pre-release centers. The reference to conducive locations is made because it reveals the legislative wisdom in granting the Bureau this power, because the statute expressly reveals this as the purpose in granting this power when it states the Bureau has the power in order to carry out effective programs, and because ascertaining the legislative purpose in order to determine its intent is a well-established rule of statutory construction, particularly, where, as here, the purpose is revealed in express terms.

Finally, Mr. Justice Roberts' concern that the Bureau will locate pre-release centers in the courtyard of the Philadelphia City Hall, Opinion of the Court n. 7, assumes the City would be a willing seller and that the Bureau would determine such a location would be conducive to rehabilitation. Perhaps the majority of this Court when it decided *Pemberton Appeal,* supra, overlooked the possibility that a school board would locate a school in that courtyard even absent the willingness of that City to sell the location because of the school board's eminent domain powers.

Suffice it to say, that the position adopted by Mr. Justice Roberts is contrary to our prior determinations,

*Pemberton Appeal,* supra, contrary to the express language of the statute, contrary to the intent revealed by that express language, and contrary to the underlying purpose of the statute which purpose is expressly stated in the statute.

I dissent.

JONES, C. J., and NIX, J., join in this dissent.